**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| AMJ CAPITAL OZ FUND I, LLC, *et al.*, | |
| Plaintiffs, | Civil Action No. 25-1397 (MAS) (JBD) |
| v. | **MEMORANDUM OPINION** |
| MZF TRUST, *et al.*, | |
| Defendants. | |

**SHIPP, District Judge**

      This matter comes before the Court upon the following three motions: (1) Plaintiffs AMJ Capital OZ Fund I, LLC ("AMJ Capital") and AMJ Partners Holdings LLC's ("AMJ Partners") (collectively, "Plaintiffs" or the "AMJ Entities") First Motion for a Temporary Restraining Order ("TRO") and Preliminary Injunction ("PI") (the "First TRO and PI Motion") (ECF No. 11); (2) Defendants MZF Trust, Prospect Capital OZ Fund, LLC ("Prospect Capital"), Michele Zahn ("Michele"), Richard Zahn ("Richard" and together with Michele, the "Zahns"), and BCC Construction, LLC's ("BCC") (collectively, "Defendants" or the "Zahn Entities") Cross-Motion to Compel Arbitration and to Dismiss Plaintiffs' Complaint and Application for a TRO and PI (ECF No. 15); and (3) Plaintiffs' Second Motion for a TRO and PI (the "Second TRO and PI Motion") (ECF No. 24).

      After Plaintiffs filed the First TRO and PI Motion, on May 7, 2025, the Court held a telephone conference with the parties. (*See* ECF No. 14.) Defendants thereafter filed the Cross-Motion to Compel Arbitration and to Dismiss Plaintiffs' Complaint and Application for a TRO and PI (ECF No. 15), which Plaintiffs opposed (ECF No. 16), and Defendants submitted a

reply in further support (ECF No. 20). Plaintiffs, in turn, replied in support of the First TRO and

PI Motion. (ECF No. 17.) After careful consideration of the parties' submissions, the Court decides

the parties' motions without oral argument pursuant to Local Civil Rule 78.1(b). For the reasons

outlined below, Defendants' Cross-Motion to Compel Arbitration is granted, and Plaintiffs' First

and Second TRO and PI Motions are denied.[1]

## I.    BACKGROUND[2]

This matter arises from a joint venture to develop a multi-family residential apartment

complex in Perry, Florida (the "Project"). (*See generally* Compl., ECF No. 1.) The crux of the

dispute is based on Defendants' purported self-dealing, misappropriation of funds, and fraudulent

conduct in the operation of a joint venture. (*Id.* ¶¶ 1-5, 80.)

### A.    Factual Background

In May 2022, the AMJ Entities, along with Prospect Capital and MZF Trust, formed

Prospect Perry Holdings, LLC (the "JV Entity"), a Delaware limited liability company created for

the purpose of developing, managing, leasing, and operating a residential apartment complex of

more than 300 rental units at 800 Everetts Way in Perry, Florida (the "Property"). (*Id.* ¶¶ 16, 18.)

Prospect Perry Apartments LLC—a single-purpose Delaware entity whose sole member is the JV

---

[1]  In light of this determination, the Court declines to issue a briefing schedule on the Second TRO and PI Motion, as Defendants request. (*See* ECF No. 25.)

[2] Generally, "a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). An exception to the general rule, however, is that a "document integral to or explicitly relied upon in the complaint may be considered without converting the motion [to dismiss] into one for summary judgment." *Id.* (internal quotation marks omitted); *see also Doe v. Univ. Scis.*, 961 F.3d 203, 208 (3d Cir. 2020). Because the contractual agreements the parties executed are "integral to" and "explicitly relied upon in the Complaint," the Court will consider these documents and the arguments the parties make relying on these documents. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426.

2

Entity—is the title owner of the Property. (*Id.* ¶¶ 20-21.) Prospect Capital and BCC are Florida limited liability companies with the same principal place of business in Florida, and are managed and controlled by the Zahns. (*Id.* ¶¶ 8, 12.) Michele is a trustee of MZF Trust and resides in Florida with Richard. (*Id.* ¶¶ 9-11.)

The JV Entity is governed by a Limited Liability Operating Agreement (the "JV Agreement").[3] (*Id.* ¶ 17.) Under the terms of the JV Agreement, AMJ Capital agreed to contribute $2,500,000 to the JV Entity, in exchange for a 46.86% membership interest. (*Id.* ¶¶ 22-23.) Prospect Capital and MZF Trust (collectively, "PREG") agreed to contribute a combined $2,834,922, in exchange for a combined 53.14% membership interest—specifically, Prospect Capital would be given a 3.48% membership interest in the JV Entity and MZF Trust would be given a 49.66% membership interest in the JV Entity. (*Id.* ¶ 22.) While AMJ Capital fulfilled its capital commitment in full, PREG only contributed $2,493,879 of their initial required investment to the JV Entity, leaving an unpaid balance of approximately $341,000. (*Id.* ¶¶ 23-25.) Plaintiffs allege that PREG failed to disclose this shortfall, misrepresented their capital contributions, and improperly diverted the missing funds for unrelated purposes. (*Id.* ¶¶ 26-29.)

The JV Agreement contains a dispute resolution clause in Section 9.8. (JV Agreement ¶ 9.8, ECF No. 15-3.) Under this provision, any member of the JV Entity who determines that a dispute exists "shall provide written notice of such [d]ispute to the other [m]ember(s), setting forth the nature of the dispute with specificity." (*Id.* ¶ 9.8(B).) The dispute shall then be resolved by an arbiter that is designated pursuant to the JV Agreement. (*Id.* ¶ 9.8(C).) Specifically, after notice of the dispute, each of the members involved in the dispute shall designate a non-affiliated individual,

---

[3] The parties often refer to the JV Agreement as the "PPH Agreement" or "Operating Agreement" in their briefing. (*See generally* First TRO and PI Mot.; Defs.' Opp'n Br., ECF No. 15-1.)

who in turn shall designate a third person to serve as the arbiter of the dispute. (*Id.* ¶ 9.8(D).) If the two selected individuals fail to agree on an arbiter, a judge in the Superior Court of the State of Delaware shall make such selection. (*Id.*) Under the dispute resolution provision of the JV Agreement, the arbiter's decision "shall be final, binding[,] and non-appealable." (*Id.* ¶ 9.8(E).) Due to the time-sensitive nature of the Project, the arbiter "will be directed to commence and pursue the [d]ispute resolution process set forth in this Section 9.8 and resolve the [d]ispute on an expedited basis." (*Id.* ¶ 9.8(G).)

BCC, which was owned and managed by Michele and/or Richard, served as the general contractor for the Project.[4] (Compl. ¶¶ 19, 30-33.) Plaintiffs allege that on October 31, 2022, the JV Entity issued a $1,325,000 loan to BCC (the "Unauthorized Loan"), without their knowledge or required consent, in violation of the JV Agreement's provisions governing "Major Decisions," which requires unanimous member approval for transactions involving related parties, substantial asset transfers, and loans. (*Id.* ¶¶ 34-44.) Plaintiffs discovered the Unauthorized Loan only after identifying a $271,625.40 receivable labeled "DUE FROM PREG" in the JV Entity's balance sheets, which prompted further inquiry and the eventual production of the unsecured promissory note dated October 31, 2022 (the "Unauthorized Note").[5] (*Id.* ¶¶ 35, 45-46.)

BCC was subsequently dissolved in December 2024. (*Id.* ¶ 49.) Plaintiffs allege that the Zahns orchestrated the dissolution of BCC to avoid repaying the loan—an action that constituted a default under the Unauthorized Note. (*Id.* ¶¶ 49-51.) They also allege that the Unauthorized Loan

_____

[4] The Complaint alleges that "Richard is the Chairman and Chief Executive Officer of BCC," and "Michele is the Chief Operating Officer of BCC." (Compl. ¶¶ 31, 32.)

[5] As of the filing date of the Complaint, at least $862,500 remains unpaid. (Compl. ¶ 47.)

constituted "Bad Conduct" under the JV Agreement and was a misuse of JV Entity funds for undisclosed purposes. (*Id.* ¶¶ 48-49.)

Plaintiffs further contend that the Zahn Entities unilaterally reallocated line items in the Project's development budget to increase BCC's general contractor fees by more than $500,000 without approval—another action that allegedly required Plaintiffs' prior consent under the JV Agreement. (*Id.* ¶¶ 52-56.) According to Plaintiffs, this diversion of funds contributed to project delays and was designed to prevent recovery of the improperly obtained fees following BCC's dissolution (*Id.* ¶ 56.)

The Complaint further asserts that the Zahn Entities failed to meet two capital calls made in 2024, and purportedly contributed only in the form of "materials" rather than the required cash contributions.[6] (*Id.* ¶¶ 57-60, 63-65.) The first, issued on January 8, 2024, sought $658,231.37 ("Capital Call No. 1"). (*Id.* ¶ 57.) AMJ Capital contributed its full share of $308,800 for Capital Call No. 1, while PREG was obligated to contribute $349,520.86. (*Id.* ¶¶ 57-59.) PREG claimed that its share for Capital Call No. 1 was fulfilled through materials provided by BCC in lieu of cash, but Plaintiffs allege that these were the same materials already claimed as partial repayment for the Unauthorized Loan. (*Id.* ¶¶ 60-61.) The second capital call, issued in June 2024, sought $2,060,615.64 ("Capital Call No. 2"). (*Id.* ¶ 63.) AMJ Capital paid $641,000 toward its $966,428.74 share for Capital Call No. 2, and PREG claimed a $923,625.86 contribution by way of "materials," again, allegedly unsupported by documentation. (*Id.* ¶¶ 63-66.)

Under the JV Agreement, if substantial completion of the Project was not achieved by March 15, 2024, liquidated damages would accrue. (*Id.* ¶ 69.) Plaintiffs allege that the Project was

---

[6] Plaintiffs contend that these materials were neither properly documented nor verifiably purchased, and that this conduct caused further delays to the Project. (Compl. ¶¶ 57-68.)

not completed on time, resulting in $776,640 in accrued liquidated damages as of February 20, 2025. (*Id.* ¶ 70.) The JV Agreement provides that such damages are the responsibility of BCC, and payment was personally guaranteed by the Zahns. (*Id.* ¶¶ 69, 72.) Plaintiffs assert that the Zahn Entities have intentionally delayed obtaining certificates of occupancy to avoid triggering their payment obligations. (*Id.* ¶ 73.) Along the same lines, Plaintiffs allege that the Zahn Entities failed to maintain and provide timely access to the JV Entity's books and records, as required under Section 8.1 of the JV Agreement. (*Id.* ¶¶ 74-75, 77.) In particular, Section 8.1 of the JV Agreement provides that the:

> [m]anager shall provide access to all requested records and books of the [JV Entity], including, without limitation, all contracts, financial information, leases, audits, litigation materials, and all other records and files with respect to the [JV Entity], the [o]wner, the Property, the Project or otherwise, no later than five (5) [b]usiness [d]ays after delivery of a written request (which may occur via email) by any [m]ember to the [m]anager.

(JV Agreement ¶ 8.1.) Plaintiffs contend that the Zahn Entities maintained incomplete and confusing records to conceal improper transfers of funds. (Compl. ¶¶ 78-79.)

On August 9, 2025, Richard unexpectedly passed away. (Suggestion of Death, ECF No. 22.) Plaintiffs subsequently investigated Richard's assets and were unable to locate any ongoing estate proceeding. (Second TRO and PI Mot. 5-6, ECF No 24-1.) Plaintiffs, however, discovered that Defendants had taken certain actions to transfer their assets since the commencement of this litigation. (*Id.* at 6.) Specifically, Plaintiffs allege that MZF Trust, Richard and Michelle sold one property in Florida on June 19, 2025, listed another property in Florida for sale, and purchased property in names other than those of Defendants. (*Id.*) Plaintiffs allege that these actions "heighten[] the risk of imminent dissipation" of relevant assets from which Plaintiffs can recover damages. (*Id.*)

**B.**     **Procedural History**

On February 21, 2025, Plaintiffs filed a nine-count Complaint asserting the following causes of action: (1) breach of contract (Count One); (2) breach of duty of loyalty (Count Two); (3) fraud (Count Three); (4) civil conspiracy (Count Four); (5) piercing the corporate veil (Count Five); (6) negligent misrepresentation (Count Six); (7) breach of covenant of good faith and fair dealing (Count Seven); (8) unjust enrichment (Count Eight); and (9) conversion (Count Nine). (*See generally id.*)

Approximately two and a half months later, on May 2, 2025, Plaintiffs filed the First TRO and PI Motion, requesting that the Court compel Defendants "to provide access to financial information and documents related to the JV Entity." (First TRO and PI Mot., ECF No. 11-1.) In opposition, Defendants filed the Cross-Motion to Compel Arbitration and to Dismiss Plaintiffs' Complaint and Application for a TRO and PI. (ECF No. 15.) Defendants move to dismiss Plaintiffs' Complaint in part for want of personal jurisdiction. (*See id.*) Plaintiffs replied in further support of the First TRO and PI Motion and opposed the Cross-Motion to Compel Arbitration and to Dismiss Plaintiffs' Complaint. (ECF Nos. 16, 17.) Without leave of Court, Defendants filed a reply in further support of their Cross-Motion to Compel Arbitration and to Dismiss Plaintiffs' Complaint (ECF No. 20), which Plaintiffs request that this Court strike as procedurally improper (ECF No. 21).[7]

On September 6, 2025, Plaintiffs filed the Second TRO and PI Motion, requesting that this Court additionally freeze Defendants' assets pending the resolution of the instant claims because

---

[7] "No sur-replies are permitted without permission of the Judge . . . to whom the case is assigned." L. Civ. R. 7.1(d)(6). Defendants failed to ask for, much less received, permission to file a sur-reply prior to its filing. Accordingly, the Court grants Plaintiffs' request to strike Defendants' sur-reply and does not consider the arguments therein.

Defendants have allegedly "taken action[s] to transfer [their] assets." (Second TRO and PI Mot. 6.) The parties' disputes are now ripe for review.

## II.    LEGAL STANDARDS

### A.    Motion to Dismiss for Lack of Personal Jurisdiction

Under Federal Rule of Civil Procedure 12(b)(2),[8] a defendant may move to dismiss an action for lack of personal jurisdiction. "[O]nce a defendant has raised a jurisdictional defense, the plaintiff must prov[e] by affidavits or other competent evidence that jurisdiction is proper." *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009) (second alteration in original) (internal quotation marks and citations omitted). In a diversity action, a New Jersey federal court "has jurisdiction over parties to the extent provided under New Jersey state law." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 96 (3d Cir. 2004) (citations omitted). "New Jersey's long-arm statute provides for jurisdiction coextensive with the due process requirements of the United States Constitution." *Id.* (citations omitted). "Thus, parties who have constitutionally sufficient 'minimum contacts' with New Jersey are subject to suit there." *Id.* (citation omitted).

A federal district court may exercise two types of personal jurisdiction: general jurisdiction and specific jurisdiction. *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-15 n.9 (1984)). General jurisdiction exists when a defendant's "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). "The 'paradigm' forums in which a corporate defendant is 'at home' are the corporation's place of incorporation and its principal place of business." *BNSF Ry. Co. v. Tyrrell*,

---

[8] All references to "Rule" or "Rules" hereafter refer to the Federal Rules of Civil Procedure.

581 U.S. 402, 413 (2017) (citing *Daimler*, 571 U.S. at 137); *see also Canal Ins. Co. v. Fema Trucking, LLC*, No. 20-17953, 2022 WL 3227188, at \*4 (D.N.J. Aug. 10, 2022) ("[G]eneral jurisdiction over a limited liability company only tends to exist in its state of citizenship.").

"For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile." *Goodyear*, 564 U.S. at 924. Specific jurisdiction allows a court to exercise jurisdiction over a non-resident defendant where: (1) the defendant "purposefully avail[ed] itself of the privilege of conducting activities within the forum"; (2) the litigation "aris[es] out of or relate[s] to the defendant's contacts with the forum"; and (3) the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice." *Id.* at 923-24 (alterations in original) (citations omitted).

When the district court does not hold an evidentiary hearing, "the plaintiff need only establish a prima facie case of personal jurisdiction[,] and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." *Miller Yacht Sales, Inc.*, 384 F.3d at 97 (citations omitted). Once the plaintiff has shown minimum contacts, the burden shifts to the defendant, who must show that the exercise of jurisdiction would be unreasonable. *See Mellon Bank (East) PSFS v. Farino*, 960 F.2d 1217, 1226 (3d Cir. 1992).

### B.    Motion to Compel Arbitration

The Federal Arbitration Act ("FAA") dictates that written arbitration agreements entered into in connection with "a contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract. . . ." 9 U.S.C. § 2. When parties seek to enforce an arbitration agreement, they may request from the court "an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." *Id.* § 4. Accordingly, the FAA grants courts the power to compel

arbitration and to stay or dismiss claims subject to a valid arbitration agreement. *Id.* § 3. Specifically, the FAA "mandates that district courts shall direct the parties to proceed to arbitration on issues . . . to which an arbitration agreement" applies. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). This mandate that courts "rigorously enforce agreements to arbitrate" stems from the legislative intent which drove the enactment of the FAA; specifically, Congress enacted the FAA to establish a strong federal policy in support of private arbitration agreements. *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987) (quoting *Dean Whitter Reynolds, Inc.*, 470 U.S. at 221).

The Third Circuit has enumerated a standard for district courts to apply when deciding a motion to compel arbitration. The Third Circuit explained:

> When it is apparent, based on the face of a complaint, and documents relied upon in the complaint, that certain of a party's claims are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay.

> But if the complaint and its supporting documents are unclear regarding the agreement to arbitrate, or if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue, then the parties should be entitled to discovery on the question of arbitrability before a court entertains further briefing on [the] question.

*Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764, 776 (3d Cir. 2013) (alteration in original) (internal quotation marks and citations omitted); *Young v. Experian Info. Sols., Inc.*, 119 F.4th 314, 319-20 (3d Cir. 2024) (clarifying *Guidotti*'s directive and explaining that when "a complaint does not set forth clearly that the claims are subject to an arbitration agreement," pre-arbitration discovery may be warranted). After limited discovery, the court may entertain a renewed motion to compel arbitration, this time judging the motion under the summary judgment standard of Rule 56. *Guidotti*, 716 F.3d at 776.

### C.      Motion for a TRO and PI[9]

"Preliminary injunctive relief is an extraordinary remedy and should be granted only in limited circumstances." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (internal quotation marks and citation omitted). This remedy should be granted only if plaintiffs establish that: (1) "they are likely to succeed on the merits of their claims"; (2) "they are likely to suffer irreparable harm without relief"; (3) "the balance of harms favors them"; and (4) "relief is in the public interest." *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017) (citation omitted). "A plaintiff's failure to establish any element in its favor renders a preliminary injunction inappropriate." *NutraSweet Co. v. Vit-Mars Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999) (citation omitted). With respect to the first factor, "on an application for injunctive relief, the movant need only make a showing of reasonable probability, not the certainty, of success on the merits." *Atl. City Coin & Slot Serv. Co., Inc. v. IGT*, 14 F. Supp. 2d 644, 657 (D.N.J. 1998) (internal quotation marks and citations omitted). In the end, however, "[t]he burden is on the moving party 'to convince the district court that all four factors favor preliminary relief.'" *Peter v. Att'y Gen. of N.J.*, No. 23-3337, 2023 WL 4627866, at *1 (D.N.J. July 19, 2023) (quoting *AT&T v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994)).

---

[9] TROs and PIs require the same elements be met. *Koons v. Reynolds*, 649 F. Supp. 3d 14, 22 (D.N.J. 2023).

## III.    **DISCUSSION**

Defendants oppose Plaintiffs' First TRO and PI Motion on several grounds.[10] (*See generally* Defs.' Opp'n Br., ECF No. 15-1.) First, Defendants contend that the Complaint and application for injunctive relief should be dismissed because the JV Agreement requires arbitration of the claims. (*Id.* at 8-17.) Second, Defendants argue that this Court lacks personal jurisdiction over them. (*Id.* at 17-18.) More specifically, Defendants assert that Plaintiffs have failed to allege facts sufficient to establish personal jurisdiction. (*See id.*)

### A.    **Personal Jurisdiction**[11]

The Court begins with Defendants' arguments regarding personal jurisdiction "[b]ecause the issue of whether this Court may exercise personal jurisdiction over [Defendants] is dispositive to the viability of the entire suit[.]" *See Exporting Commodities Int'l, LLC v. S. Mins. Processing, LLC*, No. 16-9080, 2017 WL 5513682, at *3 (D.N.J. Nov. 17, 2017).

In the Complaint, Plaintiffs assert that this Court has specific jurisdiction over Defendants because they:

> ([1]) accepted and received monies that originated from New Jersey; ([2]) participated in meetings related to the subject matter in New Jersey; ([3]) had regular telephone communications with a New Jersey entity; ([4]) solicited an entity in the State of New Jersey for business; and ([5]) sent emails and mailings to an entity in the State of New Jersey.

---

[10] Plaintiffs' Second TRO and PI Motion is largely based on the same allegations and conduct as Plaintiffs' First TRO and PI Motion. (*Compare* First TRO and PI Motion *with* Second TRO and PI Motion.) As such, the Court considers Defendants' arguments in opposition to Plaintiffs' First TRO and PI Motion when evaluating Plaintiffs' Second TRO and PI Motion.

[11] Neither party argues that the Court may exercise general personal jurisdiction over Defendants, so the Court focuses exclusively on whether it has specific personal jurisdiction.

(Compl. ¶ 14.) Defendants argue that the Complaint fails to sufficiently allege that this Court has personal jurisdiction over them because the Complaint, as alleged, is an improper "group pleading." (Defs.' Opp'n Br. 17-18.) Plaintiffs, on the other hand, argue that the Complaint sufficiently alleges personal jurisdiction because it sufficiently alleges that "Defendants, in concert, purposefully directed their activity at New Jersey, solicited business from New Jersey residents, met with Plaintiffs in New Jersey, and were in constant communication with Plaintiffs from New Jersey." (Pls.' Opp'n Br. 22, ECF No. 16.)

At the outset, the Court finds that the Complaint is not insufficiently "group pled" to warrant dismissal.[12] The Court will thus proceed to evaluate whether Plaintiffs have met their burden to show that this Court has specific jurisdiction over Defendants.

"[O]nce the defendant raises the question of personal jurisdiction, the plaintiff bears the burden to prove, by a preponderance of the evidence, facts sufficient to establish personal jurisdiction." *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 146 (3d Cir. 1992). The Supreme Court has articulated two tests for specific jurisdiction: (1) the "traditional" test—also called the "minimum contacts" or purposeful availment test, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (quoting *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945)); and (2) the so-called "*Calder* effects test," *see Calder v. Jones*, 465 U.S. 783, 787 & n.6 (1984). The *Calder* effects test and the traditional test have distinct requirements, and both tests should be considered. *See Hasson v. FullStory, Inc.*, 114 F.4th 181,

---

[12] Although opposition briefs and corresponding documents may not serve to amend Plaintiffs' Complaint, the Court will consider Plaintiffs' Supplemental Declaration as attached to their opposition, which specifies each defendant's contacts with New Jersey. (*See* Decl. of Siddharth Desai in Support of Pls.' Opp'n to Defs.' Mot. to Dismiss ("Desai Decl.") ¶¶ 4-9, ECF No. 18-1.) Plaintiffs' Supplemental Declaration largely contains the same facts as the Complaint but separates the facts as to each defendant. (*See id.*)

189-92 (3d Cir. 2024) (explaining that "the effects test . . . require[s] that the tortious actions of the defendant have a forum-directed purpose" whereas "the traditional specific jurisdiction analysis simply requires that the plaintiff's claims arise out of or relate to the defendant's forum contacts").

The traditional test for specific jurisdiction focuses on a defendant's "minimum contacts" with the forum state and entails a three-step analysis. *O'Connor*, 496 F.3d at 317. *First*, the defendant must have "purposefully avail[ed] itself of the privilege of conducting activities within the forum State." *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 451 (3d Cir. 2003) (quoting *Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 109 (1987)). This prong of the analysis requires that the defendant had "minimum contacts with the forum state that show the defendant took a deliberate act reaching out to do business in that state." *Hepp v. Facebook*, 14 F.4th 204, 207 (3d Cir. 2021) (citation omitted). *Second*, the plaintiff must show its claims "arise out of or relate to" at least one of those contacts or activities. *Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007) (quoting *Helicopteros*, 466 U.S. at 414). Courts have consistently emphasized that "[f]or the contacts to satisfy the second prong, there must be "a strong relationship among the defendant, the forum, and the litigation." *Hepp*, 14 F.4th at 208 (citation modified). *Third*, even where the foregoing requirements are met, the Court must "be satisfied that the exercise of personal jurisdiction 'comports with traditional notions of fair play and substantial justice' such that the defendant 'should reasonably anticipate being haled into court' in that forum." *Toys "R" Us*, 318 F.3d at 451 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

The alternative test, the "*Calder* effects test," was recognized by the Supreme Court in *Calder v. Jones*, holding that under certain circumstances involving intentional torts, the

14

jurisdictional analysis may focus on a defendant's intention to affect or reach the forum state with its alleged misconduct. 465 U.S. at 789-90. The *Calder* effects test requires a plaintiff to allege:

> (1) The defendant committed an intentional tort;
>
> (2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; [and]
>
> (3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity . . . .

*Christie v. Nat'l Inst. for Newman Stud.*, 258 F. Supp. 3d 494, 500 (D.N.J. 2017) (quoting *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 265-66 (3d Cir. 1998)). The *Calder* effects test, as interpreted by the Third Circuit, requires that a defendant's "conduct and connection with the forum State [must be] such that [the defendant] should reasonably anticipate being haled into court there." *Marten*, 499 F.3d at 297 (quoting *World-Wide Volkswagen Corp.*, 444 U.S. at 297). To assert specific personal jurisdiction, Plaintiffs must allege "claim-specific jurisdiction over Defendants," meaning "an affiliatio[n] between the forum and the underlying controversy." *Christie*, 258 F. Supp. 3d at 499 (second alteration in original) (quoting *Walden v. Fiore*, 571 U.S. 277, 283 n.6 (2014)).

In the Complaint, Plaintiffs assert contractual, quasi-contractual, and tort claims against Defendants. (*See generally* Compl.) Because a specific personal jurisdiction analysis is claim-specific, the Court typically analyzes claims separately.[13] *See Remick v. Manfredy*, 238 F.3d

---

[13] "The 'effects' test has often been applied where the alleged tortfeasor has de minimis contacts with the forum, *see Marten*, 499 F.3d at 297, or where the tortious conduct occurs primarily 'outside the forum' but has an 'effect . . . within the forum,' *IMO Indus.*, 155 F.3d at 261." *Hasson*, 114 F.4th at 189.

248, 255-60 (3d Cir. 2001). Claim-specific analysis, however, is not required where the claims at issue factually overlap. *O'Connor*, 496 F.3d at 318 n.3.

Here, Plaintiffs' contractual, quasi-contractual, and tort claims stem from the same underlying factual circumstances—namely, the conduct surrounding the JV Entity and the JV Agreement—and the parties have likewise addressed the issue of specific personal jurisdiction without differentiating between specific claims. The Court, therefore, will not employ a claim-specific approach to discern whether it may properly exercise specific personal jurisdiction over Defendants. *See Grant Indus., Inc. v. Isaacman*, No. 21-13094, 2022 WL 2358422, at *10 n.12 (D.N.J. June 30, 2022) (analyzing breach of contract, misappropriation of confidential information and trade secrets, fraud, and conversion claims together because they arose from the "same sequence of events and factual allegations"). Because the Supreme Court has instructed that in assessing personal jurisdiction, "[e]ach defendant's contacts with the forum State must be assessed individually," *Calder*, 465 U.S. at 790, the Court will separately assess each defendant's contacts with New Jersey.

In the Complaint, Plaintiffs bring several contractual claims.[14] (*See generally* Compl.) Under the traditional test, "an individual's contract with an out-of-state party . . . [cannot] automatically establish sufficient minimum contacts in the other party's home forum . . . ." *Burger King*, 471 U.S. at 478; *BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 261 (3d Cir. 2000) (citation omitted) ("[A] non-resident's contracting with a forum resident, without more, is insufficient to establish the requisite 'minimum contacts[.]'"). Instead, "in contract claims[,] [the Third Circuit] analyze[s] the totality of the circumstances surrounding a contract to determine

---

[14] Plaintiffs bring claims for breach of contract, breach of duty of loyalty, and breach of good faith and fair dealing. (*See generally* Compl.) Plaintiffs also bring a quasi-contract claim of unjust enrichment. (*See generally id.*)

whether the exercise of jurisdiction over the defendant is proper." *Miller Yacht Sales*, 384 F.3d at 99 (citing *Remick*, 238 F.3d at 255-56).

The Supreme Court has stressed that "the plaintiff cannot be the only link between the defendant and the forum. Rather[,] it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Walden*, 571 U.S. at 285. A defendant's communication, by telephone, email message, or regular mail, directed at a plaintiff located within the forum state, albeit in furtherance of the parties' business relationship, does not establish a substantial connection between the defendant and the forum itself. *Exporting Commodities Int'l*, 2017 WL 5513682, at *8 (holding that, although the subject contract was negotiated by email messages and phone calls directed by the defendant to the New Jersey plaintiff, those contacts did not justify personal jurisdiction over a non-forum defendant because "these are communications not so much to New Jersey as they are into the electronic ether"); *see also Merco, Inc. v. So. Cal. Edison Co.*, No. 06-5182, 2007 WL 1217361, at *6 (D.N.J. Apr. 24, 2007) (finding that the non-resident defendant's exchange of correspondence with the New Jersey-based plaintiff, using "interstate mail, [email messages], and telephone service to negotiate the contract and discuss the [p]roject's progress" did not constitute sufficient contacts to confer specific jurisdiction over the defendant).

With the appropriate standards laid out, the Court now turns to its first inquiry under the traditional test—whether Defendants purposefully directed contacts at New Jersey such that it can be said they purposefully availed themselves of the privilege of operating in and, thus, benefited from the protection of New Jersey's laws. *Burger King*, 471 U.S. at 475-76. Here, Defendants solicited business from Plaintiffs and initiated the contractual relationship with Plaintiffs—New Jersey residents. This weighs in favor of asserting jurisdiction over Defendants. *See Remick*, 238

F.3d at 256 (suggesting that reaching into a forum state to solicit a business relationship supports exercising jurisdiction); *Farino*, 960 F.2d at 1223 (finding borrowers who initiated a relationship with a forum state bank "purposefully availed themselves of the privilege of conducting business in the [forum state]"). In contracting with Plaintiffs, Defendants knew, or should have known, that they were entering into a relationship with a New Jersey company. Further, Richard, MZF Trust, Prospect Capital, and BCC also participated in meetings related to the subject matter in New Jersey.[15] (Desai Decl. ¶¶ 4, 6-7.) This provides further support to assert jurisdiction over Defendants. *Burger King*, 471 U.S. at 475 (explaining that a defendant's entrance into the forum state enhances the defendant's affiliation with that forum).

In addition to soliciting and initiating the business relationship, Defendants relied on regular contacts with Plaintiffs' New Jersey offices. Under these circumstances, it can be said that Defendants "deliberately 'reach[ed] out beyond one state and create[d] continuing relationships and obligations'" with Plaintiffs so as to satisfy the purposeful availment requirement. *Id.* at 473 (quoting *Travelers Health Ass'n v. Commonwealth of Va. ex rel. State Corp. Comm'n*, 393 U.S. 643, 647 (1950)); *see also Williams v. Zhou*, No. 14-5544, 2018 WL 648354, at *4-5 (D.N.J. Jan. 30, 2018) (purposeful availment requirement met where defendants had one meeting in New Jersey and sent email and correspondence into the state).

The Court next turns to its second inquiry under the traditional test—whether Plaintiffs demonstrate that their claims "arise out of or relate to" at least one of those contacts or activities. *Marten*, 499 F.3d at 296. In the context of contract cases, "this test examines whether any of the defendant's contacts with the forum are relevant to the merits of the plaintiff's claim." *See*

---

[15] Defendants, however, do not assert that Michele participated in meetings related to the subject matter in New Jersey. (*See generally* Desai Decl.)

*O'Connor*, 496 F.3d at 319-20. Put differently, it examines "whether the defendant's contacts with the forum were instrumental in either the formation of the contract or its breach." *Id.* at 320 (quoting *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001)). For tort claims, the Third Circuit generally calls for a "closer and more direct causal connection than that provided by the but-for test," although there is "no 'specific rule' susceptible to mechanical application in every case." *O'Connor*, 496 F.3d at 323.

Here, regardless of whether the Court views it through a contract or tort lens, the Court finds that Plaintiffs have sufficiently demonstrated their claims arise out of or relate to Defendants' contacts with New Jersey. Defendants sent numerous communications into New Jersey and arranged an in-person meeting in New Jersey that purportedly dealt with the parties' business relationship. (*See generally* Desai Decl.) More specifically, Defendants sent communications to New Jersey to contact Plaintiffs' New Jersey offices, went to New Jersey to meet regarding that business relationship, and continued to send communications into New Jersey to facilitate the business relationship. (*See id.*) And that business relationship is now the subject of this litigation. As such, the Court finds that Plaintiffs have demonstrated that their claims arise out of or relate to the contacts with New Jersey.

The final step of the specific jurisdiction analysis under the traditional test is whether "the exercise of jurisdiction would otherwise comport with 'traditional notions of fair play and substantial justice.'" *O'Connor*, 496 F.3d at 324 (citation omitted). Jurisdiction is at this point presumptively constitutional. *Id.* (citation omitted). A defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477. Relevant considerations are "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiffs' interest in obtaining convenient and effective

relief, [and] the interstate . . . judicial system's interest in obtaining the most efficient resolution of controversies[.]" *O'Connor*, 496 F.3d at 324 (quoting *Burger King*, 471 U.S. at 477). Only in rare cases is it unreasonable to assert jurisdiction over defendants who have "purposefully engaged in forum activities." *Pennzoil Prods. Co. v. Colelli & Assocs., Inc.*, 149 F.3d 197, 207 (3d Cir. 1998) (quoting *Asahi Metal Indus. Co.*, 480 U.S. at 116). Here, Defendants have not carried their burden. Defendants do not present any argument as to why jurisdiction would be unreasonable under this third part of the test. They have, therefore, failed to present "a compelling case" to defeat specific personal jurisdiction. As such, the Court finds that it has personal jurisdiction over Defendants.[16]

### B.    Compel Arbitration

Having found that this Court has personal jurisdiction over Defendants, the Court next turns to Defendants' Cross-Motion to Compel Arbitration. In determining whether to compel arbitration, a court must consider: "(1) whether there is a valid agreement to arbitrate between the parties[;] and, if so, (2) whether the merits-based dispute in question falls within the scope of that valid agreement." *Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 220 (3d Cir. 2014) (citation omitted).

At the outset, the Court notes that the parties do not dispute that: (1) the signatory defendants, MZF Trust and Prospect Capital (collectively, the "Signatory Defendants"), entered into a valid and binding agreement to arbitrate, i.e., the JV Agreement; and that (2) the arbitration provision contained in the JV Agreement (Section 9.8) is broad in scope. (*See* Pls.' Opp'n Br. 11.) The non-signatory defendants Michele, Richard, and BCC (collectively, the "Non-Signatory Defendants"), however, dispute the existence of a binding arbitration agreement. (Pls.' Opp'n Br. 18-20.) The Court must therefore determine whether the arbitration provision in the JV Agreement

---

[16] Because the Court finds that it has specific jurisdiction under the traditional test, it need not consider the *Calder* effects test.

binds the Non-Signatory Defendants and whether the claims asserted against Defendants fall within the scope of the arbitration provision.

### 1.    *Whether the Parties Entered an Arbitration Agreement.*

Under Delaware law, which governs here,[17] "[a] valid contract requires an offer, acceptance, and consideration, and the parties must have intended that the contract would bind them." *Shilling v. Shilling*, 332 A.3d 453, 462 (Del. 2024). The contract must also "contain all material terms in order to be enforceable" and "sufficiently definite" terms. *Id.*

Here, Section 9.8 of the JV Agreement requires arbitration of "[a]ny dispute between the [m]embers relating to the [JV Entity] or this Agreement, either directly or indirectly . . . ." (JV Agreement ¶ 9.8.) It is not disputed that Michele, Richard, and BCC are not signatories to the JV Agreement, nor were they ever formally made parties to the JV Agreement in some other way. Plaintiffs, however, seek to bind the Non-Signatory Defendants to the JV Agreement under the doctrine of "equitable estoppel," which "prevent[s] a non-signatory from embracing a contract, and then turning its back on the portions of the contract, such as an arbitration clause, that it finds distasteful." *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 199-200 (3d Cir. 2001).

"It is not unusual for courts to require arbitration of claims involving parties who were not formally parties to an arbitration agreement, a situation that especially arises when affiliates of signatories are subject to or make claims." *McLaughlin v. McCann*, 942 A.2d 616, 627 (Del. Ch. 2008). "Courts have recognized at least five theories for binding non[-]signatories to arbitration

---

[17] A court deciding whether the parties agreed to arbitrate a certain matter should apply "ordinary state-law principles governing contract formation." *China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp.*, 334 F.3d 274, 290 (3d Cir. 2003) (citation omitted). Here, the parties do not dispute that Delaware law applies based on the JV Agreement.

agreements: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel." *BuzzFeed, Inc. v. Anderson*, No. 22-357, 2022 WL 15627216, at *8 (Del. Ch. Oct. 28, 2022). Here, the theory of equitable estoppel is dispositive.

Under Delaware law, a non-signatory to a contract can compel a signatory to arbitrate under an equitable estoppel theory. *Wilcox & Fetzer, Ltd. v. Corbett & Wilcox*, No. 2037-N, 2006 WL 2473665, at *4 (Del. Ch. Aug. 22, 2006). This theory applies in two circumstances:

> *First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the non[-]signatory.* When each of a signatory's claims against a non[-]signatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate. *Second, application of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the non[-]signatory and one or more of the signatories to the contract. Otherwise the arbitration proceedings between the two signatories would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted.*

*Id.* at *5.

Here, the Court finds that, at the very least, the second circumstance referenced in *Wilcox & Fetzer* applies here. Indeed, Plaintiffs, themselves, have conceded that it does apply, acknowledging that their allegations against both the Signatory Defendants and Non-Signatory Defendants set forth facts of "a concerted scheme between signatories and non-signatories to defraud Plaintiffs." (Pls.' Reply Br. 20, ECF No. 18.) Plaintiffs, in their Complaint, expend a lot of ink articulating that Defendants—which include Signatory Defendants and Non-Signatory Defendants—acted in concert with one another to engage in their scheme to defraud Plaintiffs. (*See generally* Compl.); *Lismore v. Societe Generale Energy Corp.*, No. 11-6705, 2012 WL 3577833, at *7 (S.D.N.Y. Aug. 17, 2012) (finding that a signatory's claims are intertwined when

the claims "arise from the 'subject matter' of the agreement with the arbitration clause"). So, to the extent that Plaintiffs must proceed to arbitration with their claims against the Signatory Defendants, Plaintiffs' claims against the Non-Signatory Defendants should too.

>    2.    *Whether the Dispute at Issue Falls Within the Scope of the Arbitration Agreement.*

Plaintiffs assert contractual, quasi-contractual, and tort claims against Defendants. (*See* Compl. ¶¶ 81-143.) Where, as here, the parties dispute the arbitrability of a claim, Delaware law requires a two-step analysis. First, the court must determine whether the arbitration clause is broad or narrow in scope. *Wilcox*, 2006 WL 2473665, at *3. Second, the court should apply the relevant scope of the provision to the asserted legal claim to determine whether the claim falls within the scope of the contractual provision that require arbitration. *Id.*

Section 9.8 of the JV Agreement provides that "[a]ny dispute between the [m]embers relating to the [JV Entity] or this Agreement, either directly or indirectly, will be resolved in accordance with the provisions of this Section 9.8." Here, as previously noted, the parties do not dispute that the arbitration provision in the JV Agreement is broad in scope. (*See* Pls.' Opp'n Br. 10.) And, the Court finds no reason to find that the JV Agreement's arbitration provision, under Section 9.8, is narrow in scope. *See Ishimaru v. Fung*, No. 929, 2005 WL 2899680, at *14 (Del. Ch. Oct. 26, 2005) (finding an arbitration provision that stated "all controversies arising between [m]embers, or one or more [m]embers and the [c]ompany, concerning this [a]greement" to be broad). The Court, therefore, turns to the second step of its analysis—whether the claims asserted in Plaintiffs' Complaint and the First and Second TRO and PI Motions fall within its scope.

Having found that the arbitration provision in the JV Agreement is broad, the Court "will defer to arbitration on any issues that touch on contract rights or contract performance." *Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 155 (Del. 2002). As to whether asserted

claims fall within the broad arbitration clause, "[a]n arbitration clause, no matter how broadly construed, can extend only so far as the series of obligations set forth in the underlying agreement[,]" meaning such clauses "should be applied only to claims that bear on the duties and obligations under the [a]greement." *Id.* at 156. To determine whether the claims "bear on the duties and obligations" of the JV Agreement, the Court must determine whether the claims "would be independently and separately assertable" had there been no agreement between the parties. *Id.* at 157.

Defendants, on the one hand, assert that Plaintiffs' claims in their Complaint touch on contract rights or contract performance and are thus subject to arbitration. (Defs.' Opp'n Br. 10-13.) Plaintiffs, on the other hand, contend that "Delaware Courts recognize that some claims, specifically those of civil conspiracy, fraud, unjust enrichment, piercing the corporate veil and conversion, not only fall outside the scope of the provision but will also need to be asserted along with other traditional contract claims."[18] (Pls.' Reply Br. 11.)

Here, the Court finds that Plaintiffs' claims in the Complaint are arbitrable as they either directly or indirectly relate to the JV Entity or the JV Agreement. To begin, Plaintiffs' allegations underpinning their contractual claims for breach of contract (Count One) and breach of covenant of good faith and fair dealing (Count Seven) touch on contract rights or contract performance.

---

[18] The following four cases that Plaintiffs rely on in support of their position are inapposite: (1) *Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 151 (Del. 2002); (2) *Car Auction and Reinsurance Solutions, Inc. v. Copart*, No. 07C11-163, 2009 WL 2914391, at *1 (Del. Super. Ct. Sept. 10, 2009); (3) *James Julian, Inc. v. Raytheon Service Co.*, 424 A.2d 665, 667 (Del. Ch. 1980); (4) *Kerr-McGee Chem., LLC v. Kemira Pigments Oy*, No. 03-101, 2003 WL 22299045, at *1 (D. Del. 2003). (Pls.' Opp'n Br. 11-12, 15.) Rather, it appears that the cases cited by Plaintiffs support the proposition that, under Delaware law, a party is required to arbitrate claims that "touch on the rights" of the arbitration agreement at issue. It does not appear to stand for the proposition that claims of civil conspiracy, fraud, unjust enrichment, piercing the corporate veil, and conversion are non-arbitrable and necessarily "need to be asserted along with other traditional contract claims." (*Id.* at 11.)

More specifically, Plaintiffs' allegations for their breach of contract claims directly reference obligations under the JV Agreement. (*See* Compl. ¶ 84 ("Pursuant to the JV Agreement, PREG was required to satisfy capital calls and other obligations under the JV Agreement"); *id.* ¶ 133 ("PREG failed to perform the obligations under the JV Agreements with good faith and fair dealing by failing to satisfy their investment and capital call obligations, failing to inform the AMJ Entities of the accurate status of the JV entity and the Project.").) Next, Plaintiffs' claims for negligent misrepresentation (Count Six) and piercing the corporate veil (Count Five) sufficiently touch upon the contractual rights or performance.[19] Plaintiffs allege that Defendants provided inaccurate information to Plaintiffs about the Project and the JV Entity and that they misled Plaintiffs into believing that they had satisfied all of their monetary obligations under the JV Agreement. (*See id.* ¶¶ 22-80.) Moving on to Plaintiffs' claims for civil conspiracy (Count Four), unjust enrichment (Count Eight), and conversion (Count Five), these counts contain factual allegations that Defendants misappropriated funds in violation of the JV Agreement, which, in the Court's view, sufficiently touches upon the JV Agreement. (*See id.* ¶¶ 29, 30-56, 68.) Next, Plaintiffs' breach of duty of loyalty claim (Count Two) has a direct bearing on the JV Agreement since the JV Agreement gives rise to the rights and responsibilities of the members. *See Douzinas v. Am. Bureau of Shipping, Inc.*, 888 A.2d 1146, 1149-50 (Del. Ch. 2006).

This leaves the Court with Plaintiffs' fraud claim (Count Three). In the Complaint, Plaintiffs allege that:

> [The Zahns], by and through the Zahn Entities and on behalf of themselves, made false representations about: (1) the use of funds in

---

[19] The Court notes that Plaintiffs "reallege and incorporate by reference each of the preceding paragraphs as if fully set forth at length [th]erein" for their negligent misrepresentation and piercing the corporate veil claims. (Compl. ¶¶ 111, 125.) In the preceding paragraphs, Plaintiffs rely on the JV Agreement to support their claims, especially their breach of contract claim. (*Id.* ¶¶ 82-89.)

> connection with the Project; (2) effectuating the purpose of the JV Entity; (3) loans made to BCC; (4) amounts paid to BCC; (5) purchase of materials for the Project; (6) status of the Project; and (7) the financial condition of the JV Entity.

(Compl. ¶ 97.) These allegations, which concern the Project, JV entity, and BCC, relate to the JV Entity and the JV Agreement. Indeed, Plaintiffs' fraud claim arises out of the JV Agreement.

Moreover, to the extent that Plaintiffs argue that Defendants used "the JV Entity as a vehicle to enrich themselves through the use of deceptive tactics and maneuvers," (Pls.' Reply Br. 15), when "the allegations underlying the claims touch matters covered by an arbitration agreement, then those claims must be arbitrated, whatever the legal labels attached to them." *Brayman Constr. Corp. v. Home Ins. Co.*, 319 F.3d 622, 626 (3d Cir. 2003) (citation modified). Furthermore, "[u]nder Delaware and federal law, a party cannot escape a valid . . . arbitration clause[] by arguing that the underlying contract was fraudulently induced or invalid for some reason unrelated to the forum selection or arbitration clause itself." *Carlyle Inv. Mgmt. L.L.C. v. Nat'l Indus. Grp. (Holding)*, No. 5527, 2012 WL 4847089, at *10 (Del. Ch. Oct. 11, 2012), *aff'd*, 67 A.3d 373 (Del. 2013). Plaintiffs do not contend that the JV Agreement, or Section 9.8 of the JV Agreement, was procured by fraud. The Court, therefore, sees no reason to find that Plaintiffs' fraud claim is non-arbitrable.

Notwithstanding this, Plaintiffs contend that there is no objective indication that the parties contemplated arbitrating claims of fraud, civil conspiracy, corporate veil piercing, conversion, and unjust enrichment. (Pls.' Reply Br. 16.) Plaintiffs further contend that "[i]t is unfathomable that a dispute of this nature can be 'resolve[d] . . . on an expedited basis and in any event within ten (10) [b]usiness [d]ays after the [d]ispute is first submitted to the [a]rbiter." (*Id.* at 17-18 (quoting JV Agreement ¶ 9.8(G).) The Court disagrees with both contentions. To the extent that Plaintiffs disagree with the intent of the parties, the JV Agreement provides that "[a]ny dispute between the

[m]embers relating to the [JV Entity] or this Agreement, either directly or indirectly, will be resolved in accordance with the provisions of this Section 9.8." (JV Agreement ¶ 9.8(A).) Section 9.8 also goes a step further. It provides a reason why a speedy dispute resolution process was essential:

> The *[m]embers acknowledge that since development of the Project as well as operations of the components of the Project after construction are time sensitive and since lengthy delays caused by unresolved [d]isputes cannot be tolerated*, the [a]rbiter will be directed to commence and pursue the [d]ispute resolution process set forth in this Section 9.8 and resolve the [d]ispute on an expedited basis and in any event within ten (10) [b]usiness [d]ays after the [d]ispute is first submitted to the [a]rbiter.

(JV Agreement ¶ 9.8(G) (emphasis added).) As such, the Court sees no reason to find that the parties did not contemplate arbitration of claims for fraud, unjust enrichment, civil conspiracy, and conversion.[20] Based on the foregoing, the Court grants Defendants' Cross-Motion to Compel Arbitration.

---

[20] Furthermore, to the extent that Plaintiffs argue that Section 9.8 is ambiguous concerning whether it covers claims for fraud, unjust enrichment, civil conspiracy, and conversion, the Court would still find that their claims must be arbitrated. The Third Circuit has long recognized that the FAA "is a congressional declaration of a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). And "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Id.* at 24-25; *see also Stateside Mach. Co. v. Alperin*, 591 F.2d 234, 240 (3d Cir. 1979) ("[D]oubtful issues regarding the applicability of an arbitration clause are to be decided in favor of arbitration."). A "plausible" argument that the arbitration clause covered a particular claim constitutes sufficient doubt to compel arbitration. *See Sharon Steel Corp. v. Jewell Coal & Coke Co*., 735 F.2d 775, 778 (3d Cir. 1984). Here, Defendants' argument that Plaintiffs' claims for fraud, unjust enrichment, civil conspiracy, and conversion are covered under the arbitration provision in the JV Agreement is plausible. Put differently, it cannot be said "with positive assurance" that Section 9.8 of the JV Agreement is not susceptible to an interpretation that covers these claims. *See id.*

## C.    Injunctive Relief

Finally, the Court considers Plaintiffs' motions for injunctive relief. In the First TRO and PI Motion, Plaintiffs seek an order compelling Defendants to provide Plaintiffs access to financial records and documents, including construction loan draw information and documents related to the JV Entity. (*See generally* First TRO and PI Mot.) Plaintiffs' arguments rest in part on the contention that the JV Agreement entitles them to this information. (*Id.* at 9.) In the Second TRO and PI Motion, Plaintiffs request that the Court additionally freeze Defendants' assets pending the resolution of the dispute, asserting that "Defendants have taken action since the commencement of this litigation to move assets around" and that the continued "dissipation of assets" would render any eventual judgment "a moral win and nothing else." (Second TRO and PI Mot. 10.)

Preliminary injunctions are reserved for "extraordinary situations" and present numerous concerns, including the nature of proceedings, the granting of a remedy based upon a prediction of the law, and the prejudging of the merits of a case. *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 198-200 (3d Cir. 2024). When faced with a motion for preliminary injunction and a motion to compel arbitration, courts generally do not reach the merits of the underlying dispute because their jurisdiction "is limited to staying the civil action and compelling the parties to arbitrate." *Thompson v. Nienaber*, 239 F. Supp. 2d 478, 484-85 (D.N.J. 2002) (citing *John Hancock Mut. Life Ins. Co. v. Olick*, 151 F.3d 132, 136-37 (3d Cir. 1998)). The Third Circuit, however, has recognized a narrow exception to this rule, and has held that courts have jurisdiction to consider the merits of the dispute for the "sole purpose of determining whether temporary injunctive relief is necessary" to preserve the status quo pending the arbitration of the dispute. *Thompson*, 239 F. Supp. 2d at 484-85; *see also Ortho Pharm. Corp. v. Amgen, Inc.*, 882

F.2d 806, 812 (3d Cir. 1989). To succeed on a motion for a preliminary injunction in an arbitrable case, a party must demonstrate:

> (1) that it is likely to succeed on the merits in the arbitration proceeding; (2) that it will be irreparably harmed in the meantime in a manner that threatens to render the arbitration proceeding meaningless if the court does not grant preliminary injunctive relief pending the outcome of the arbitration proceeding; (3) that the possibility of harm to . . . other interested persons if injunctive relief is granted would not outweigh the harm it will suffer if injunctive relief is denied; and (4) that the injunction it seeks will serve the public interest.

*Thompson*, 239 F. Supp. 2d at 485 n.9 (quoting *Wright Med. Tech., Inc. v. Somers*, 37 F. Supp. 2d 673, 679 (D.N.J. 1999)). The Third Circuit has emphasized that the first two factors—likelihood of success and irreparable harm—are essential, and that a court may not grant injunctive relief, "regardless of what the equities seem to require," unless plaintiffs carry their burden of establishing these two factors. *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-86 (3d Cir. 2000); *see also Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 197 (3d Cir. 1990) (citation omitted) (placing particular weight on the probability of irreparable harm and the likelihood of success on the merits, stating: "[W]e cannot sustain a preliminary injunction ordered by the district court where either or both of these prerequisites are absent.") Accordingly, if the movant fails to carry its burden on these two elements, the motion for injunctive relief should be denied. *See Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir. 1989).

Here, in both motions for injunctive relief, Plaintiffs fail to demonstrate that they will be irreparably harmed in a manner that threatens to render the arbitration proceeding meaningless.

### 1.    *First TRO and PI Motion*

In Plaintiffs' First TRO and PI Motion, Plaintiffs argue that they will be irreparably harmed absent injunctive relief because Plaintiffs will not be able to assess and evaluate the direction of

the JV Entity without access to the requested financial information and documents concerning the JV Entity. (First TRO and PI Mot. 9.) Plaintiffs further argue that, without such access, their "bargained-for right[s]" to assess and evaluate financial information and records under the JV Agreement will be adversely impacted, and that this is an "irreparable harm that no money award can cure."[21] (*Id.* at 10.)

To demonstrate irreparable harm, a movant must show "that remedies available at law, such as monetary damages, are inadequate to compensate for that injury." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The Third Circuit has recognized two circumstances in which irreparable harm may arise from a breach of contract: "(1) where the subject matter of the contract is of such a special nature or peculiar value that damages would be inadequate; or (2) where because of some special and practical features of the contract, it is impossible to ascertain the legal measure of loss so that money damages are impracticable." *ECRI v. McGraw Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) (citation omitted). If, however, the loss on a breach of contract claim "is capable of ascertainment and award at final judgment," the plaintiff cannot demonstrate an immediate risk of actual irreparable harm. *Levine v. BlockFi Inc.*, No. 21-11934, 2021 WL 3508831, at *2 (D.N.J. Aug. 9, 2021) (citation omitted).

Here, Plaintiffs' claims do not fall within either exception as articulated in *ECRI*. As a preliminary point, the record contains no evidence to support Plaintiffs' bald and unsupported assertions that Plaintiffs would be unable to assess and evaluate the direction of the Project without access to the requested financial information and records. Even assuming arguendo that such

---

[21] Defendants filed correspondence on May 6, 2025, indicating that they have provided documents to Plaintiffs' counsel to satisfy Plaintiffs' request that Defendants provide "all the draws submitted to the lender since draw #25," rendering Plaintiffs' First TRO and PI Motion moot. (Defs.' Correspondence 2, ECF No. 13.) Plaintiffs, however, contend that the draw documents provided by Defendants' counsel are incomplete or insufficient. (*Id.* at 2 n.1.)

access is necessary, Plaintiffs still fail to show that the denial of access to such documents is not capable of ascertainment or cannot be remedied through damages at final judgment. Rather, Plaintiffs' allegations make clear that they "seek[] financial compensation from the [D]efendants in the form of money damages" and that they are "readily capable of calculating the proposed proper measures of their damages with precision." *Stephen Zouras, LLP v. Marrone*, No. 20-2357, 2022 WL 107186, at *2 (M.D. Pa. Jan. 11, 2022) (denying preliminary injunction); (*see* Compl. ¶¶ 61-70 (alleging with specificity $776,640 in liquidated damages as of February 20, 2025); *id.* ¶¶ 80-143 (alleging only monetary damages as a result of Defendants' conduct).) Accordingly, Plaintiffs "ha[ve] not shown an immediate irreparable harm justifying a preliminary injunction that cannot be compensated with monetary damages." *Washington v. Folino*, No. 11-1046, 2013 WL 12180929, at *2 (W.D. Pa. June 27, 2013), *report and recommendation adopted*, No. 11-1046, 2013 WL 12180930 (W.D. Pa. July 15, 2013); *see Stephen Zouras, LLP*, 2022 WL 107186, at *2 (denying preliminary injunction and stating that the "ready availability of adequate monetary damages belies a claim of irreparable injury").

Defendants' alleged breach of their duties in the JV Agreement does not change this outcome. As the Third Circuit explained, it is not sufficient to allege that a defendant's breach will deny a plaintiff the resources needed to meet its contractual obligations. *Bennington Foods LLC v. St. Croix Renaissance Grp., LLC*, 528 F.3d 176, 178-79 (3d Cir. 2008). Rather, the party seeking an injunction must establish that its business is "different from other types of commerce in such a way that normal breach of contract remedies could not provide a remedy." *Id.* at 179. Here, Plaintiffs have not shown that the subject matter of the JV Agreement is of such a unique value that monetary damages would be an inadequate remedy, or that the JV Agreement contains unique features such that monetary damages would be impractical or impossible to measure. Accordingly,

they have failed to demonstrate irreparable harm that would render the arbitration meaningless. *See Grant Heilman Photography, Inc. v. John Wiley & Sons, Inc.*, 864 F. Supp. 2d 316, 325 (E.D. Pa. 2012) (explaining that preliminary injunctions should not be issued "merely to allay the fears and apprehensions or to soothe the anxieties of the parties").

### 2.    *Second TRO and PI Motion*

Plaintiffs' Second TRO and PI Motion fares no better. Plaintiffs request that the Court freeze Defendants' assets until this case is resolved, because Richard's recent death "injects a new, uncontrollable variable . . . that can rapidly deplete estate assets or force their transfer to out-of-state jurisdictions" and that Defendants' recent asset transfers may render any money judgment awarded in this case meaningless. (*See* Second TRO and PI Mot. 11-12.) But the Supreme Court has made it clear that district courts have "no authority to issue a preliminary injunction preventing [defendants] from disposing of their assets pending adjudication of [a plaintiff's] contract claim for money damages." *Grupo Mexicano De Desarrollo v. Alliance Bond Fund*, 527 U.S. 308, 333 (1999). As such, to the extent that Plaintiffs seek injunctive relief to freeze assets that Defendants may eventually need to satisfy any monetary award issued against them, such a motion "is speculative and premature," and Plaintiffs have not shown that they are entitled to the extraordinary form of injunctive relief they seek. *Victor v. SCI Smithfield*, No. 08-1374, 2011 WL 6003923, at *6 (M.D. Pa. Nov. 30, 2011) (denying preliminary injunction to freeze defendants' assets where the only remedy plaintiff sought in the underlying dispute was monetary damages).

Moreover, arbitrators can issue injunctive relief where warranted. *See also Pyo v. Wicked Fashions, Inc.*, No. 09-2422, 2010 WL 1380982, at *7 (D.N.J. Mar. 31, 2010). Even assuming Defendants continue to deny Plaintiffs access to financial information and documents of the JV Entity, or dissipate their assets, Plaintiffs provide no evidence, argument, or basis to support a

finding that sending this case to arbitration would render the arbitration meaningless when Plaintiffs could ask the arbitrator for the injunctive relief they seek. *See Thompson*, 239 F. Supp. 2d at 485 n.9 (explaining that when parties are subject to an arbitration agreement, courts may only issue injunctive relief where a party "will be irreparably harmed . . . in a manner that threatens to render the arbitration proceeding meaningless").[22]

As such, the Court finds that Plaintiffs have not demonstrated irreparable harm in a manner that threatens to render the arbitration proceeding meaningless, and accordingly denies Plaintiffs' First and Second TRO and PI Motions on this basis.

---

[22] While the Court recognizes that the possibility of an unsatisfied money judgment may constitute irreparable injury for purposes of granting a preliminary injunction, the Court is unable to identify evidence from the record currently before it that supports a finding that Plaintiffs "will probably be unable to recover those funds," in the absence of a preliminary injunction. *Hoxworth*, 903 F.2d at 197, 205-06. Significantly, Plaintiffs have not: (1) "provided an approximate value of the [assets] belonging to [Defendants] to enable the Court to relate the value of the assets sought to be encumbered to the likely value of the expected judgment"; (2) "demonstrated the absence of any alternative source of assets subject to [Defendants'] possession and control that could satisfy a potential future judgment"; or (3) produced any evidence from which this Court could infer that a "preliminary injunction is necessary to prevent Defendants from consuming, dissipating, or fraudulently conveying any proceeds realized from the sale of various assets" belonging to Defendants. *Michael v. GLD Foremost Holdings, LLC*, No. 15-02230, 2017 WL 11151118, at *2 (M.D. Pa. Apr. 28, 2017); *see Elliott v. Kiesewetter*, 98 F.3d 47, 57 (3d Cir. 1996). Should Plaintiffs seek similar injunctive relief in the arbitration proceedings, Plaintiffs are advised to develop a record in further support of the requested relief.

### D.    Stay

"When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding." *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024). Here, Plaintiffs request a stay. (Pls.' Reply Br. 23-25.) The Court, accordingly, stays the proceeding pending arbitration.

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, Defendants' Cross-Motion to Compel Arbitration is granted, and Plaintiffs' First and Second TRO and PI Motions are denied. The Court will issue an Order consistent with this Memorandum Opinion.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE